# In the Iowa Supreme Court

No. 24–0834

Submitted May 29, 2025—Filed October 31, 2025

**Iowa Department of Health and Human Services,**

Plaintiff,

vs.

**Iowa District Court for Polk County,**

Defendant.

On review from the Iowa Court of Appeals.

Certiorari to the Iowa District Court for Polk County, Susan Cox, district associate judge.

The attorney and guardian ad litem for the minor child seeks further review of a court of appeals decision that concluded the juvenile court exceeded its statutory authority to review the Iowa Department of Health and Human Services's choice to change the placement of a child in its custody. **Decision of Court of Appeals Vacated; Writ Annulled.**

Christensen, C.J., delivered the opinion of the court, in which all justices joined.

Brenna Bird, Attorney General, and Michelle R. Becker, Assistant Attorney General, for plaintiff.

Nicole Garbis Nolan and Jami J. Hagemeier of the Youth Law Center, Des Moines, attorneys and guardians ad litem for the minor child, for defendant.

**Christensen, Chief Justice.**

The transfer of a child's placement within juvenile court can be successfully accomplished "and still show few or no long-term effects when it's done properly, slowly, and with the support of all of the adults in the child's life." *In re K.D.*, 975 N.W.2d 310, 322 (Iowa 2022) (quoting *In re I.P.*, No. 19–0715, 2019 WL 3317922, at *3 (Iowa Ct. App. July 24, 2019)). That requires collaboration between the court, guardian ad litem (GAL), Iowa Department of Health and Human Services (HHS), and other professionals involved with the child's best interests as the paramount concern. This case is both a reminder of how important that collaboration is and of the problems that arise when it does not occur.

A routine scheduling conference quickly spiraled into a power battle when, upon the children's attorney and GAL's[1] request under Iowa Code section 232.102(1)(*b*)(1) (2024), the juvenile court ordered HHS not to move a child in its custody until the juvenile court could conduct an evidentiary hearing to review the proposed move. HHS responded by arguing in a motion to reconsider that the juvenile court exceeded its authority by making its own placement decision for the child and stripping HHS of its custodial abilities. Even after the juvenile court clarified that it was simply ordering HHS not to *move* the child until there was an evidentiary hearing, HHS continued to contest the juvenile court's authority and refused the juvenile court's offer to conduct a hearing. Instead, it filed the petition for writ of certiorari at issue, which we granted.

---

[1]The same person served as both the children's attorney and GAL, but we will refer to her as the GAL for brevity's sake. *See* Iowa Code § 232.89(4).

In a split decision, the court of appeals sustained the writ. Although it found HHS's actions "troubling," it concluded that the juvenile court exceeded its statutory authority by suspending HHS's attempt to move the child without "making the requisite findings required by statute." On further review, we disagree. Iowa Code chapter 232 governs these proceedings and prioritizes the child's best interests. The juvenile court's exercise of its statutory authority to review HHS's placement decision did just that by temporarily staying any move and thus potentially preventing unnecessary harm and trauma to the child until the court could review the proposed move. This interpretation of the chapter 232 provision at issue furthers chapter 232's design as both a preventative and remedial statutory scheme.

## I. Background Facts and Proceedings.

Trinity (pseudonym) was born on September 16, 2022, and has been involved with HHS ever since. Mom's involvement spans even longer, as she had already had Trinity's three older siblings removed from her custody and adjudicated children in need of assistance (CINA) before Trinity's birth.[2] When Trinity was less than a month old, HHS filed a CINA petition on Trinity's behalf. The juvenile court removed Trinity from Mom's custody shortly thereafter and transferred custody to HHS "for purposes of relative placement (if possible), family foster care and/or shelter."

HHS placed Trinity with a different foster family from her siblings, one of whom lived with a suitable other placement while the other two lived together in the same family foster home. Trinity remained in her foster home placement— apart from her siblings—throughout the CINA proceedings. HHS did not attempt

---

[2]The children's fathers had little to no interaction with them and are not at issue in this proceeding.

to find a home that would concurrently plan to adopt Trinity and her middle siblings together until Trinity was about eleven months old. This was also when HHS recommended termination of Mom's parental rights.

Mom consented to the termination of her parental rights to the oldest sibling but contested termination of her rights to the other three children at a trial that occurred in December 2023. At trial, the HHS case manager testified that Mom received a supervised weekly visit with the three children together in addition to separate visits with Trinity, who was about thirteen months old at the time. Further, she testified that HHS was "still kind of working out the concurrent plan for the three younger children," explaining it had "an adoptive referral out to find a home for all three [be]cause that would be the preference to keep them together just due to their attachment and bond." Nevertheless, she declared that Trinity's foster parents would like to be considered the concurrent plan for Trinity, while another family was interested in adopting Trinity's two siblings.

Mom's attorney expressed confusion to the case manager, stating, "I thought you testified that you have a referral in for a placement for all three children?" The case manager replied, "Yes, that would be -- the preference is to keep -- from -- like in terms of concurrent planning, the preference is to keep all three of the [siblings] together." Mom's attorney followed up: "So if you find a concurrent plan that would take all three children, would that be where you're planning on placing them?" The case manager could not give a concrete answer, surmising,

> It depends. There's the timing issue. I mean, obviously, if we are down the line of things, we're -- and we have the children in, you know, homes that -- where they're settled and, you know, [Trinity's] in a home that she's been in the entire time and is willing to be a concurrent plan and then this other home that we're looking at is

willing to take just the two and adopt them, it doesn't make sense to make another move for the children. That's traumatic. However, this referral, it just depends. You never know when a home's going to be found.

So, obviously, the preference would be all three children together. However, we're trying to make sure that we're doing due diligence in looking [at] all options. And so given the fact that the [two siblings' current foster parents] are not the concurrent plan, that's why we put the referral in for all three, [be]cause that would be the ultimate preference to keep all three of the children together.

Mom's attorney also sought clarification about the case manager's lack of knowledge regarding the respite providers' involvement with the foster parents of Trinity's siblings. The case manager indicated that she was unaware that the foster parents of Trinity's siblings had been relying on these respite providers to watch the children in some capacity, stating that "it was ongoing for quite a bit of time," but she did not know "the full extent of, like, how frequently it was going on." Mom's attorney questioned whether anybody "knew this was happening," and the case manager declared, "No, not originally."

After trial, the juvenile court left the record open through January 15, 2024, for the parties to submit written closing arguments. While the juvenile court awaited these written arguments, HHS moved Trinity's siblings to the home of the respite providers discussed during the termination trial, who had since become licensed foster parents and expressed their willingness to be the concurrent plan for all three children. Before the juvenile court issued its termination decision, Mom moved to reopen the record on March 14 to present new evidence of her recent treatment progress. The juvenile court granted Mom's request and set the matter for a scheduling conference. Moreover, it entered a separate order terminating the parental rights of the children's fathers that directed the children "remain placed in [HHS] custody for purposes of foster care placement."

At the scheduling conference on March 21, while the termination record was still open for Mom to present new evidence, the GAL discovered HHS's intention to move Trinity into the foster home of her two siblings. This conference did not include a court reporter, so our understanding of what occurred is based on the parties' representations in other filings and the transcript of the subsequent hearing on the HHS's motion to reconsider. According to this information, the GAL resisted the move and sought an evidentiary hearing on the issue of Trinity's placement and guardianship. The juvenile court granted the GAL's hearing request, indicating it would consider the issue during Mom's reopened termination trial on May 23. In the meantime, the juvenile court prohibited HHS from moving Trinity from her foster home "without a specific court order identifying the emergency reasons."

A day after the scheduling conference, an Assistant Attorney General filed an appearance on behalf of the State and HHS "for the limited purposes of litigating the placement of the child, herein," and later moved for the juvenile court to reconsider the order and "strike the provision that [HHS] is prohibited from exercising its statutory duties as custodian."[3] HHS declared that it "has been continuously, actively engaged in efforts to find a pre-adoptive placement where all three children could be together." HHS maintained that it alone had the authority to select Trinity's placement and that the juvenile court exceeded its limited authority to review HHS's placement decisions.

In a written response, the GAL indicated that she and a caseworker in her office had conversations with HHS about Trinity's placement that led them "to

---

[3]When HHS and the county attorney disagree on the appropriate course of action, HHS "may request that the state be represented by the attorney general in place of the county attorney. If the state is represented by the attorney general, the county attorney may continue to appear in the proceeding" to present the county attorney's position. Iowa Code § 232.114(3).

believe that the Department planned not to move [Trinity]." She also claimed that she had previously engaged in a "significant and successful battle" to thwart HHS's attempt to move Trinity and her siblings to a home "with no electricity or running water who won't own telephones or use plastic in any manner and believe that days should be spent repenting." Thus, she suggested that HHS intentionally failed to notify the GAL before moving Trinity this time. The GAL further resisted the State's motion because Mom was still Trinity's legal guardian and was attempting to reunify with her.

On the day before the hearing, the GAL filed a report recommending "that [Trinity] remain in her current foster home. It is the only home that she has ever known and there are children in that home that are the only children she has known as siblings."

At the hearing on HHS's motion, the juvenile court admitted the GAL's requested exhibit over the State's objection for relevancy. The exhibit was a letter from Katherine Scott, the pediatric nurse practitioner at Blank Children's Hospital, who cared for Trinity as part of the Drug Endangered Child program. Scott cautioned that "[c]hanging [Trinity's] environment now could cause behavioral challenges, attachment difficulties, and long-term effects like aggression, academic difficulties, relationship problems, depression, and anxiety." Scott acknowledged the importance of sibling relationships but stressed that removing Trinity "from the only home she has ever known, even if it means being with her siblings, could have lasting detrimental effects on her health and well-being."[4]

---

[4]Although HHS now argues that this evidence was improper because it was "new evidence," this objection showcases how this case shifted the priority away from Trinity's best interests. Notably, the hearing in question was an equitable proceeding subject to relaxed rules of evidence, so the juvenile court was "allowed to make use of hearsay and other evidence that would normally be excluded in our district courts." *In re A.M.*, 856 N.W.2d 365, 373 (Iowa 2014).

When asked how it was in Trinity's best interests for HHS to move Trinity before an evidentiary hearing, HHS explained,

> [B]y saying to the Department, you don't have the authority to move a child -- and I would point out, Judge, move a child to be with her siblings -- everything that you just said, Judge, is an evidentiary hearing. And if we want to have an evidentiary hearing as to -- to make a best interest determination, what concerns me is it appears that the guardian ad litem makes a motion and the Court rules, and there was no evidence before it on that topic. No one was given a reasonable opportunity to be heard.

HHS never answered the juvenile court's repeated questioning of how moving "[a] child who's already been disrupted and traumatized through the process . . . fit into the overarching rationale under 232" to prioritize Trinity's best interests. It continued to assert its authority, instead.

Notably, the Polk County Attorney's Office disagreed with HHS and requested "a new order that prior to a move, an evidentiary hearing be held where parties can present evidence to determine whether or not the Department[] acted in the best interest of the child or the move would be in the best interest of the child." Mom's attorney remarked that Trinity was currently being well cared for and agreed with the juvenile court's concern that moving Trinity so close to the termination trial could make it difficult to properly evaluate Mom's relationship with Trinity. The juvenile court offered to commence an evidentiary hearing to consider whether HHS's planned move was in Trinity's best interests, but HHS declined.

In its written ruling, and at the request of the GAL, Mom's attorney, and the Polk County Attorney's Office, the juvenile court ordered Trinity to "remain in her current placement and that prior to any move an evidentiary hearing be held for the Court to determine if it's in the child's best interest." It reasoned, "[HHS] has not always looked at [Trinity's] best interest. Additionally, the Court

needs [Trinity] to remain in her safe, stable placement to properly evaluate the mother's bond with the toddler as it relates to tpr exceptions and also what is in the toddler's best interest."

Before Mom's reopened termination trial commenced or any evidentiary hearing was held, HHS filed a petition for writ of certiorari, which we granted and transferred to the court of appeals. In a split decision, the court of appeals sustained the writ, concluding that the juvenile court exceeded its statutory authority by suspending HHS's attempt to move Trinity without "making the requisite findings required by statute." We granted the GAL's application for further review.

## II. Mootness Does Not Preclude Our Review.

Since we granted certiorari, Mom's parental rights have been terminated, the juvenile court awarded guardianship and custody to Trinity's long-term foster parents, and the court of appeals reversed the juvenile court's guardianship order and remanded the case for the juvenile court to enter a new order returning guardianship of Trinity to HHS. *See In re T.T.*, No. 25–0072, 2025 WL 862145, at *3 (Iowa Ct. App. Mar. 19, 2025); *see also Riley Drive Ent. I, Inc. v. Reynolds*, 970 N.W.2d 289, 296 (Iowa 2022) ("An appellate court may consider matters technically outside the district court record in determining a question of mootness."). Thus, our decision on whether the juvenile court exceeded its authority by suspending HHS from moving Trinity without an evidentiary hearing is moot given the changed circumstances. *See Riley Drive Ent. I, Inc.*, 970 N.W.2d at 296 (explaining that an issue is moot when the court's decision will no longer matter due to changed circumstances). Nevertheless, we reach the merits under the public importance exception to mootness because this case presents a public issue that is likely to recur yet evade appellate review due to

the expedited nature of child welfare proceedings. *See Wallace v. Wildensee*, 990 N.W.2d 637, 642–43 (Iowa 2023) (noting the court weighs the public nature of the issue, the desirability of judicial guidance on future conduct, and the likelihood of recurrence of an issue that will evade appellate review in applying the public importance exception); *see also In re T.T.*, 2025 WL 862145, at *4 (Greer, J., specially concurring) (discussing the need for clarity on the process to review HHS's placement decisions before moving a child in its custody).

**III. The Juvenile Court Acted Within Its Authority by Suspending HHS's Movement of the Child Until It Could Conduct an Evidentiary Hearing.**

HHS maintains that the juvenile court exceeded its statutory authority by requiring an evidentiary hearing before HHS moved Trinity. A writ of certiorari is appropriate when a party is alleging that the lower court exceeded its jurisdiction or otherwise acted illegally. *Doe v. Iowa Dist. Ct.*, 18 N.W.3d 250, 257 (Iowa 2025). Because this case is before us on an original certiorari action, we review the juvenile court's ruling for correction of errors at law. *Id.*

We apply the same standard of review for issues of statutory interpretation. *Id.* at 254. This includes our interpretation of Iowa Code section 232.102(1), which governs the postdispositional placement hearing at issue, and the nearly identical provisions throughout Iowa Code chapter 232 that govern the placement of children removed from their homes at other phases in a CINA proceeding, *see id.* §§ 232.78(8) (placement following removal through an ex parte order), .95(7) (postadjudicatory hearing placement).

Under this statutory scheme, a juvenile court may transfer legal custody of a child after a dispositional hearing to HHS for placement within defined categories, such as adult relatives or licensed foster care providers. *See id.* § 232.102(1)(*a*). Once HHS has legal custody of the child, it has "the authority to

select the specific person or facility within that category for placement, subject to court review at the request of an interested party." *Id.* § 232.102(1)(*b*)(1). The juvenile court "shall give deference" to HHS's placement decision, but deference does not mean blind acceptance that freezes the juvenile court out of any meaningful review of HHS's decision. *Id.* § 232.102(1)(*b*)(2); *see also In re D.D.*, 955 N.W.2d 186, 197 (Iowa 2021) (Christensen, C.J., concurring specially) ("[T]here is a difference between reasoned deference to the opinions of professionals involved in the case and blind acceptance on substantive matters."). A party opposing HHS's placement must prove that HHS "failed to act in the child's best interests by unreasonably or irresponsibly failing to discharge its duties in selecting a suitable placement for the child." Iowa Code § 232.102(1)(*b*)(2).

Following HHS's unsuccessful attempt to place Trinity and her siblings in a home with no running water or electricity, HHS attempted to move Trinity from her long-term foster home to a new foster home. An interested party—the GAL—asked the juvenile court to review that move before HHS implemented it. The district court scheduled a hearing on the matter and issued an order temporarily staying HHS from moving Trinity until it had considered whether the move was in Trinity's best interests. Presumably, it would have used this hearing to examine whether HHS had "unreasonably or irresponsibly fail[ed] to discharge its duties in selecting a suitable placement for the child." *Id.*

We will never know how the juvenile court would have analyzed the situation because HHS declined to participate in an evidentiary hearing on the planned move, and we divested the juvenile court of jurisdiction by granting HHS's petition for writ of certiorari to resolve this power battle over who has more

control over Trinity.[5] HHS maintains that it can make a placement decision and implement it by moving Trinity into a new home over the GAL's opposition, and the juvenile court cannot even temporarily stay that move to first review whether it is in Trinity's best interests. Rather, HHS argues, the juvenile court can only limit its custodial authority to make placement decisions after finding that it acted unreasonably or irrationally in the discharge of its duties.

HHS's interpretation is troubling because it disregards the paramount concern that guides all matters arising out of CINA and termination of parental rights proceedings: the best interests of the child. *See, e.g.*, *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022) ("The paramount concern in a termination proceeding is the child's best interests."); *In re L.T.*, 924 N.W.2d 521, 529 (Iowa 2019) ("[R]easonable efforts can, and often do, include efforts toward reunifying a family, but the child's health and safety are paramount and conditions precedent to these efforts."). Iowa Code section 232.1 requires us to liberally construe chapter 232 "to the end that each child under the jurisdiction of the court shall receive . . . the care, guidance and control that will best serve the child's welfare and the best interest of the state." Any interpretation of the authority granted to HHS and the juvenile court in Iowa Code section 232.102 must comport with this interpretation prioritizing the child's best interests. *See State v. Boone*, 989 N.W.2d 645, 649–50 (Iowa 2023) ("We read statutes as a whole, meaning we look beyond the isolated words and phrases to obtain a construction that is in harmony with surrounding provisions.").

---

[5]In its petition for writ of certiorari, HHS claims that the juvenile court "substituted its judgment for that of the Department" by applying a best-interests analysis instead of examining "the reasonableness and responsibility of the Department's actions." We do not view the juvenile court's order that way, as it only suspended HHS from moving Trinity until it had a chance to conduct a hearing on the matter.

In fact, the statute that HHS emphasizes to support its decision to move Trinity to a home with her siblings reiterates the importance of the child's best interests. *See* Iowa Code § 232.108(1). It states,

> If the court orders the transfer of custody of a child and siblings to the department or other agency for placement under this chapter, the department or other agency shall make reasonable efforts to place the child and siblings together whenever possible *if such placement is in the best interests of each child*. The requirement of this subsection remains applicable to custody transfer orders made at separate times *provided the requirement will not jeopardize the stability of placements and is in the best interests of each child.*

*Id.* (emphases added).

Thus, while the statutory scheme in chapter 232 does not explicitly authorize the juvenile court to prohibit moving a child until after a hearing on the placement decision, such a temporary stay may be needed to protect the child's best interests when an interested party requests review of the decision. Take the facts of this case as an example. When the GAL discovered HHS's plan to move Trinity from her longstanding foster home to a new, untested placement, the juvenile court had just reopened Mom's termination record to receive new evidence of Mom's progress. Under HHS's plan, Trinity would move from her longstanding foster home to a new foster home with her siblings, and if Mom was successful in reunification, Trinity would move yet again.

Alternatively, if the parties had proceeded to an evidentiary hearing in which the GAL successfully proved that HHS "failed to act in the child's best interests by unreasonably or irresponsibly failing to discharge its duties in selecting a suitable placement for" Trinity after HHS already moved her, the juvenile court is faced with a new conundrum. *Id.* § 232.102(1)(*b*)(2). Is it in the child's best interests to move her again—this time, possibly separating her from the siblings that precipitated the move in the first place? Or is it in Trinity's best

interests to keep her in the new placement despite HHS's failure to responsibly discharge its duties in selecting that placement? Either result would fail to provide for Trinity's best interests.

HHS's sudden urgency to place the siblings together at this stage is concerning, not only considering its prior attempt to move the children to an unsafe home, but also because Trinity had never lived with any of her three siblings during her first eighteen months. According to the record, HHS did not request an adoption referral for a home that would take Trinity and her middle siblings together until Trinity was almost one year old. At the termination trial months later, the case manager still could not articulate a concurrent plan for all three children. This was evident from her inability to answer the questions from Mom's attorney and the GAL that sought to determine whether HHS had an adequate transition plan in place to establish a permanent home for the children. *See In re K.D.,* 975 N.W.2d at 321–22 (discussing HHS's posttermination transition obligations).

The court of appeals majority reasoned that the "review" authorized by Iowa Code section 232.102(1)(*b*)(1) can only be retrospective, after the change in placement occurs. *See id.* ("If the court places custody of the child with the department pursuant to paragraph '*a*', . . . the department shall have the authority to select the specific person or facility within that category for placement, subject to court review at the request of an interested party."). We disagree with its restrictive reading of the statute. Reviews can occur either beforehand or after the fact, and there is nothing in the language of section 232.102(1)(*b*) that limits them to being retrospective. Indeed, the statute provides that the department's selection of a person or facility for placement is not just reviewable—but "subject to court review." *Id.*

Chapter 232 is "preventative as well as remedial." *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006) (quoting *In re L.L.*, 459 N.W.2d 489, 494 (Iowa 1990)). HHS's interpretation of the placement review process hinders both the juvenile court's ability to prevent probable harm to Trinity and its ability to remedy that harm. *Cf. id.* ("[Our statutory termination provisions] are designed to prevent probable harm to the child and the State is not required to wait until actual harm has occurred before moving to terminate a parent's rights."). This interpretation runs contrary to the language of Iowa Code section 232.102(1)(*b*)(1), which states:

> If the court places custody of the child with the department pursuant to paragraph "*a*", the court may identify a category listed in paragraph "*a*" for placement of the child, but the department shall have the authority to select the specific person or facility within that category for placement, *subject to court review at the request of an interested party.*

(Emphasis added.) Judicial review of HHS's placement decision could be seriously impeded if it could only occur after the child has already been moved and subject to the possibility of more trauma. *See Miller v. Westfield Ins.*, 606 N.W.2d 301, 305 (Iowa 2000) (en banc) (presuming the legislature included every part of a statute for a purpose and intended each part to be given effect). A judicial ruling after the fact that the move was not in the child's best interests is of little consolation to the child forced to endure that trauma.

The juvenile court did not exceed its jurisdiction or act illegally by suspending a move in Trinity's placement until it could conduct an evidentiary hearing to review the move. Therefore, we annul the writ. *See Doe*, 18 N.W.3d at 257 ("A writ of certiorari lies when a district court exceeds its jurisdiction or otherwise acts illegally." (quoting *State v. Iowa Dist. Ct.*, 989 N.W.2d 652, 654 (Iowa 2023))). In doing so, we decline to address HHS's additional claims on

appeal involving the scope of deference to HHS, the admission of certain evidence, and the statutory preference to place siblings together. We are addressing the statutory authority of the juvenile court under a mootness exception. No exceptions apply to HHS's other claims, and our decision on them no longer matters because of changed circumstances. *See Riley Drive Ent. I, Inc.*, 970 N.W.2d at 296.

### IV. Conclusion.

We vacate the decision of the court of appeals and annul the writ.

**Decision of Court of Appeals Vacated; Writ Annulled.**